**Commonwealth v. Brady**

*Stephen B. Harris*, Assistant District Attorney, for Commonwealth.

*William J. Carlin*, of *Begley, Carlin, Mandio, Kelton & Popkin*, and *Marvin L. Portney*, for defendants.

*Ward F. Clark*, of *Pratt, Clark, Gathright & Price*, and *Frederick E. Smith*, of *Smith & Toner*, for witnesses.

LUDWIG, J., May 24, 1973.—This is a Superior Court Rule 46 opinion, the Commonwealth having appealed from our denial of its petition under the Witness Immunity Act of November 22, 1968, P. L. 1080 (No. 333), 19 PS §640.1, et seq.

Defendants are Warren Brady and Henry George, supervisors of Bensalem Township, Bucks County, each of whom was bound over to court on charges of extortion and prohibited acts by a public officer. A conspiracy charge against both was withdrawn by the district attorney at the preliminary hearing.

On February 16, 1973, separate bills of indictment against each defendant were presented to the Bucks County Grand Jury convened for the January 1973 term of court. At this proceeding, two witnesses, both of whom are named in the indictments as the givers of the rewards, Joseph D'Egidio and John Carmerlengo, refused to answer certain questions on the ground of the privilege against self-incrimination.[1] Following this, we sustained their refusals, and in an effort to compel them to testify, the Commonwealth, acting through the Attorney General, joined in by the Bucks County District Attorney, petitioned to have these witnesses immunized against prosecution.

At hearing held March 16, 1973, the Commonwealth

---

[1] Joseph D'Egidio is named in both bills of indictment and John Carmerlengo, in the Henry George indictment.

offered proof of the need for the requested immunity petition, as required by sections 1 and 2 of the above-cited act, 19 PS §§640.1 and 640.2: Riccobene Appeal, 439 Pa. 404, 418 (1970). Defendants are alleged to have extorted and received money and other valuable rewards from these witnesses in return for favorable voting action on zoning changes and subdivision proposals. It was our opinion, however, that the Immunity Act does not, in the circumstances, empower the granting of immunity to these witnesses, despite the vital prosecutorial need for their testimony. In so concluding, we considered two principal reasons.

First, the act is couched in language suggesting that as to grand juries it pertains only to those engaged in conducting an investigation, not to those the function of which, as here, is the finding of indictments. The title of the act speaks of "certain grand juries, investigating committees or commissions and courts of record." Section 2 provides that the petition of the Attorney General "shall set forth the *nature of the investigation* and the need for immunization of the witness": 19 PS §640.2. (Emphasis supplied.)

However, we need not become embroiled in these distinctions.[2] This is so because we found dispositive a second set of objections to the granting of immunity. Section 1 of the act restricts its scope to "a proceeding relating to organized crime or racketeering": 19 PS §640.1. It specifies, in section 6, that "[a]s used in this act—'organized crime' and 'racketeering' shall include, but not be limited to, conspiracy to commit murder, bribery or extortion, narcotic or dangerous

---

[2] In Smith v. Gallagher, 408 Pa. 551, 568 (1962), Justice Musmanno noted that "[t]he confusion between a Special Grand Jury and a Regular Grand Jury conducting a special investigation has produced a terminological melange to which, unfortunately, even judges have contributed."

drug violations, prostitution, usury, subornation of perjury and lottery, bookmaking or other forms of organized gambling": 19 PS §640.6. The Commonwealth contended that the act thus equates "organized crime and racketeering" with each of the subsequently enumerated crimes and, further, that one of these is the substantive crime of "extortion," not "conspiracy to commit . . . extortion." We disagreed, on both points.

A common-sense reading of section 6 impels the conclusion that the enumerated crimes were not intended to be co-extensive with the more abstract terms, "organized crime and racketeering." It is obvious that in a given instance such crimes may or may not be the product of underworld criminality, and frequently they are not. In this sense, "organized crime and racketeering" appear in the act as words of limitation, and the particular crimes set forth are simply illustrative of such a classification or category and, as such, are ejusdem generis.

Nor does the use of the word "include" impart equality of meaning. Instead, there are two entirely different consequences, either restrictive or enlarging depending on the context: Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania, 148 Pa. Superior Ct. 261, 265-266 (1942); Weller & Weller v. The Grange Mutual Casualty Insurance Co., 105 Pa. Superior Ct. 547, 551 (1932). Clearly "organized crime and racketeering" does not "include" each section 6 crime in the sense of enlargement, but in the dictionary sense of "the containment of something as a constituent, component, or subordinate part of a larger whole": Webster's Seventh New Collegiate Dictionary (1967).

The history of the act adds support to the belief that to avail itself of the immunity exception to the privilege against self-incrimination, the Commonwealth

must show more than the bare elements of a section 6 crime. Immediately before its enactment, there was no such immunity law in the Commonwealth. Article III, sec. 32, of the Pennsylvania Constitution, repealed in 1967, had provided for "use" immunity in order to control "any person . . . to testify in any lawful investigation or judicial proceeding against any person . . . charged with . . . bribery or corrupt solicitation, or practices of solicitation . . . ." By comparison, the immunity legislation of 1968, as introduced, enabled the granting of immunity ". . . in any proceedings . . . to any person": Senate Bill 1507, 1968 Session, May 22, 1968. However, upon the third and final consideration by the House of Representatives on July 17, 1968, later concurred in by the Senate, immunity was strictly confined, by the amendment of section 1, to "a proceeding relating to organized crime or racketeering"; and section 6 was also added to the bill. If the legislature had intended the result now urged by the Commonwealth it could have accomplished it directly via the model of the former constitutional provision, which simply limited itself to proceedings relating to particular criminal acts.

Our interpretation of section 6 is in accord with Commonwealth v. Kolakowski, 55 Erie 21, 24 (1972), which appears to be the only authority to have previously reported its consideration of the question. Referring to section 6, Judge McClelland's dictum poignantly observed: "I do not . . . believe that our Legislature intended to separate these specific changes from an equally specific relationship to 'organized crime' and 'racketeering' . . . I cannot believe that 'prostitution,' for example, in this context would include the sad soul who attempts to earn some money for herself alone but . . . only include 'prostitution' when it is an integral part of 'organized crime' and 'racketeering'."

Many other examples of implausible results from a contrary reading of section 6 are readily apparent.

Kolakowski, a prosecution for blackmail, refused immunity to a witness appearing at a preliminary hearing on the narrow ground that this particular criminal charge is not expressly designated in section 6. The opinion notes, however, that immunity was granted a witness in Erie County in a case of bribery, a section 6 crime. Riccobene, supra, also concerned a bribery but as part of a grand jury investigation of organized crime and governmental corruption. In Garber Immunity Petition, 5 Pa. Commonwealth Ct. 544 (1972), the witness had declined to testify in an investigation of a similar nature before the Pennsylvania Crime Commission.

Subsequent legislation touching on the subject matter of organized crime and racketeering, The Pennsylvania Corrupt Organizations Act of 1970, December 8, 1970, P. L. 874 (No. 276), as amended, 18 PS §3921, et seq. (repealed by the Crimes Code of December 6, 1972, P. L. 1068 (No. 334), sec. 5(a), 18 Pa. C.S. §5(a), but repeated in substance and rearranged as §911) raises a question as to the correctness of our reading of the Immunity Act of 1968. Having the stated purpose of combating organized crime, it is structured with new civil and penal remedies and procedures to prohibit and punish what it denominates as a "pattern of racketeering activity." In turn, the phrase "racketeering activity" is defined as meaning any of a list of enumerated indictable acts and offenses, consisting of all of the substantive crimes found in section 6 of the Immunity Act plus others, together with conspiracy to commit any of such offenses. Id., section 3, 18 PS §3923(1), Crimes Code, 18 Pa. C.S. §911(h)(1). It also authorizes the use of the Immunity Act to compel witnesses to testify in civil

racketeering investigations and proceedings brought to restrain a pattern of racketeering activity. Id., section 9, 18 PS §3929, Crimes Code, 18 Pa. C.S. §911(g). "Statutes in pari materia shall be construed together, if possible, as one statute": Act of November 25, 1970, P. L. 707 (No. 230), 1 Pa. C.S. §1932(b). The difficulty in this case, however, is that such statutory construction would not produce a consistent or even clear result.

For example, section 6 of the Immunity Act defines organized crime and racketeering as including "conspiracy to commit murder, bribery, or extortion . . . bookmaking or other forms of organized gambling." The words "conspiracy to commit" at least arguably were intended to apply not only to murder but to all of the substantive crimes specified. Certainly, this appears to be the natural and nontechnical understanding of such a word arrangement or grammatical format. Perhaps a logical explanation is that the complicity of two or more persons is deemed to be inherent in any form of organized crime. Moreover, racketeering has at times been defined as "[a]n organized conspiracy to commit the crimes of extortion or coercion . . . The fear which constitutes the legally necessary element in extortion is induced by . . . threats to do an unlawful injury to the property of the threatened person . . . and to kill, kidnap, or injure him or a relative": Black's Law Dictionary, 4th Ed. (1957). See United States v. McGlone, 19 F. Supp. 285, 287 (E.D. Pa., 1937), "[r]acketeering activity" is not thus defined in the Corrupt Organizations Act, §911, of 18 C.P.S.A. But the focus of that act is a "pattern of racketeering activity," which is defined as "a course of conduct requiring two or more acts of racketeering activity one of which occurred after the effective date of this act": Id., §3923(4), Crimes Code, 18 Pa. C.S.

§911(h)(4). This concept of the repetition of criminal acts, rather than of a conspiracy or concerted action, as the basis of organized crime or racketeering, is not in pari materia with the Immunity Act and impairs a unified interpretation of the two statutes.[3]

The Commonwealth asserts that the word order of section 6 should not be determinative of its meaning. One of the substantive crimes is "bribery," and bribery, according to this argument, is by definition a conspiracy and, therefore, a conspiracy to commit bribery could not have been intended. We agree that the elements of bribery necessarily include conspiracy. See *Comm. v. Kilgallen,* 379 Pa. 315, 326 (1954); *Comm. v. Marmon,* 210 Pa. Superior Ct. 202, 212 (1967). But, in 1968, this did not rule out the possibility of a common-law conspiracy to commit bribery: Commonwealth v. Richardson, 229 Pa. 609, 611 (1911). Furthermore, a substantive bribery may be limited to two participants, yet a conspiracy for this purpose may embrace others. Organized crime often operates in just this manner. We think it much more unlikely that the legislature would have contemplated immunity only in cases of the substantive crimes plus conspiracy to commit murder, but not in the substantive crime of murder or, conversely, only in conspiracy to commit murder but not in conspiracy to commit any of the other crimes.

The need for immunity from prosecution and the desire for efficacious law enforcement must be weighed with the significance of the privilege against self-incrimination and the potential for abuse occasioned by the power to immunize. Probably, it is most im-

---

[3] The Corrupt Organizations Act appears to be substantially the same as a federal law enacted two months earlier, the Organized Crime Control Act of 1970, October 15, 1970, P. L. 91-452, 84 Stat. 941, 18 USCA §1961, et seq.

peratively needed and most salutory where there has been an agreement to carry out criminal activity for the benefit of organized crime. By their nature, these agreements or compacts are arrived at in secrecy. The essense of a conspiracy is the unlawful agreement: Commonwealth v. Wilson, 449 Pa. 235, 238 (1972). Hence, it is understandable that the legislature should have authorized the extra leverage of the immunity power to be brought to bear in investigations involving conspiracies in aid of organized crime. It is our personal belief, as we stated of record, that further legislation should be enacted authorizing the granting of immunity in all cases of governmental corruption.

For the reasons discussed, it was our opinion that the present case did not come within the provisions of the Immunity Act of 1968.